IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ELLIS M. HAMMONDS, individually and by and through his Next Legal Friend, NORMAN E. HAMMONDS, )<br>)<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UNITED STATES OF AMERICA, through its' agents, servants and employees or agents, servants, and employees of its' agency, )<br>)<br>)<br>)<br>Defendant. ) | 2:07-cv-00349-JEO |

## MEMORANDUM OPINION

This case is before the court on the motion of the defendant, United States of America ("United States" or "the defendant"), for summary judgment. (Doc. 27).[1] The issues have been fully briefed. (Doc. 28, 30 & 34). For the reasons set out herein, the court finds that the defendant's motion is due to be granted.

## PROCEDURAL HISTORY

The plaintiff, Ellis M. Hammonds ("Hammonds" or "the plaintiff"), filed a complaint alleging a negligence claim against the United States under the Federal Tort Claims Act ("FTCA") (28 U.S.C. §§ 1346(b) and 2671) for injuries he purportedly sustained as a result of the failure of his Veterans Administration dentist, Dr. Rex Adams, to "administer the proper antibiotic prophylactic treatment" before commencing a dental procedure. (Complaint at ¶ 6).[2]

---

[1] References to "Doc. ___" are to the documents as numbered by the clerk of court in the court's record of the case.

[2] The complaint is located at document 1. The plaintiff filed an amended complaint on November 14, 2008, asserting that the dental procedure he underwent was "a sedative-induced dental procedure," that is, a carious pulp removal, and not "teeth extractions" as originally alleged. *Compare* doc. 1 at ¶ 5 and doc. 15 at ¶ 2.

The defendant asserts in the present motion and accompanying brief (doc. 27 & 28) that there are no genuine issues of material fact disputing (1) whether any federal agent owed a duty to the plaintiff, (2) whether any federal agent breached a duty owed the plaintiff, and (3) whether any conduct by a federal agent proximately caused the plaintiff's injuries.  The plaintiff disputes the defendant's assertions.  (Doc. 30).

## FACTS

On November 3, 2005, Hammonds presented to the Veterans Administration Medical Center in Birmingham, Alabama, ("VA") for a sedative-induced dental procedure.[3]  Hammonds had a medical history that included bilateral hip replacement surgeries in 2003.  He did not have any history of heart problems prior to the dental procedure.  It is this treatment incident that is the basis of the plaintiff's allegations.

Previously, on October 4, 2005, Dr. Dennis Rafferty saw the plaintiff at the VA Dental Clinic.  (Dr. Allen Cashion Deposition ("Cashion Dep.") at p. 40).[4]  Rafferty did a comprehensive oral evaluation and prescribed antibiotics for the plaintiff before his teeth cleaning that was scheduled for that day.  *Id*.  The plaintiff had his teeth cleaned as scheduled by a hygienist.  *Id*. at 41.

Hammonds was directed to take four capsules containing a prophylactic antibiotic by mouth one hour prior to the cleaning.  According to Dr. Adams, Hammonds was a candidate for

---

[3]The procedure was a carious pulp removal ("pulp removal").

[4]Cashion's deposition is located at document 34, exhibit 1.  The court has used the deposition page numbers herein for clarity, not the electronic numbers at the top of the document.

the antibiotics because of his hip replacement surgeries.[5] The plaintiff was scheduled for a dental procedure on November 3, 2005, to "restore a carious tooth."[6]  *Id*. at 45.

On or about October 25 or 26, 2005, Dr. Cashion wrote a prescription for the plaintiff for antibiotics for the November 3, 2005, procedure. *Id*. at p. 67. Cashion could not specifically recall in his deposition why he wrote the prescription, but speculated that someone on his staff "would have likely told [him] that [the plaintiff] had upcoming dental appointments and pointed out that he had his hip surgery within the past two years and that he may need antibiotics prophylaxis before some of his future appointments."[7]  *Id*. at pp. 67-68.

According to Dr. Adams, prior to commencing the dental procedure on November 3, he asked Hammonds if he had taken the antibiotics one hour earlier and Hammonds answered that

---

[5] According to Cashion, the antibiotics are to be taken thirty to sixty minutes before the procedure. (Cashion Dep. at p. 43).

[6] A carious tooth is basically "a decayed tooth." *Id*. at 45. This procedure involves anesthetizing the tooth; evacuating the caries; determining how much sound tooth remains; and, choosing a restorative material. *Id*. at 49-50.

[7] Cashion testified that the American Academy of Orthopedic Surgeons and the American Dental Association have recommended that some patients who have artificial joint replacements have antibiotic prophylaxis prior to some dental procedures." *Id*. at p. 19. According to Cashion the organizations "stratify different procedures into high risk and low risk categories." *Id*. They recommend antibiotic prophylaxis for the high risk procedures because they are more likely to result in transient bacteremia. *Id*. at 20. Low risk procedures include tooth restoration and fillings, taking x-rays, examinations and placing orthodontic brackets. *Id*. at 20-21. High risk procedures would include tooth extractions, periodontal surgery, periodontal scaling and cleaning and routine prophylaxis if it's likely to result in significant bleeding. *Id*.

Cashion further testified that although Hammonds was a high risk patient because of his prior surgery being within the last two years, the November 3 procedure, however, was "low risk". *Id*. at pp. 71-72. Thus, according to Cashion, it was up to the "clinical judgment of the practitioner to decide" if a pre-procedure antibiotic was necessary. *Id*. at p. 73. He then concludes that, based on the dental records, Adams decided that Hammonds needed the antibiotic. *Id*. at pp. 73-74.

The concern with regard to artificial joints is that if bacterium exists – bacteria in the bloodstream – "it's theoretically possible that these bacteria can seed the artificial joint and affect the joint." *Id*. at pp. 78-79.

he had. (Dr. Rex Adams Dep. ("Adams Dep.")[8] at pp. 9-10, 29-30).[9] Hammonds counters that Dr. Adams never asked whether he had taken the antibiotics. Adams sedated the plaintiff and began drilling his tooth. Thereafter, according to the plaintiff, he informed Adams that he did not take the antibiotics. (Ellis Hammonds Deposition ("Hammonds Dep.")[10] at pp. 16 & 34). After receiving the medication, Adams continued with the procedure, but without waiting for an hour to pass.[11] *Id*.

> According to the medical records review by Cashion, on November 3, 2005, Adams
>
> excavated a carious tooth on tooth number three and had a pulp[12] exposure at the time of the excavation. He (Adams) felt that tooth was still restorable and was planning to refer him (Hammonds) to have a root canal done on the tooth and placed a temporary filling until that could be arranged.

(Cashion Dep. at pp. 61-62). The progress notes further indicate that the plaintiff was "premed [sic] with two grams of Amoxicillin prior to [the] dental procedure." *Id*. at p. 64.

On November 23, 2005, the plaintiff experienced fever, chills, and feeling weak. Dr. Mohammed S. Jasser was consulted to determined the cause of Hammonds's symptoms. Dr. Jasser determined that Hammonds had infective endocarditis which he believes the plaintiff

---

[8] Adams' deposition is located at document 35-3. The page numbers refer to the original numbers on the deposition, not the numbers on the top of the documents from the electronic filing.

[9] Adams stated that the plaintiff was a candidate for the antibiotics because of his hip replacement. *Id*. at p. 10. Specifically, he stated that the standard of care in November 2005 required the use of "two grams of Amoxicillin one hour prior to the dental appointment." *Id* at pp. 16 & 36-37. The purpose was to "prevent any infection in the joints that had been replaced." *Id*. at p. 17. He further stated that the American Heart Association guidelines did not recommend antibiotic prophylaxis to prevent heart infections. *Id*. at p. 21.

[10] Hammonds' deposition is located at document 35-2 (ex. 1).

[11] The medical records reflect that "the patient was premedicated with two grams of Amoxicillin." Cashion Dep. at p. 77. According to Cashion this means that Adams "would have had to have asked the patient whether he took it or administered it himself." *Id*.

[12] "Pulp" is the blood and nerve supply of the tooth. *Id*. at 65.

likely contracted during the dental procedure on November 3.  (Hammonds Dep. at p. 43).  Dr. Jasser also asserts that properly taken antibiotics would have greatly reduced the chances of Hammonds contracting the infective endocarditis.  Dr. Jasser's professional opinion was derived from using differential diagnosis[13] which was premised on a physical examination of Hammonds and a review of his medical history.

## STANDARD OF REVIEW

Summary judgment is to be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1437 (11th Cir. 1991) ("Four Parcels") (quoting *Anderson*, 477 U.S. at 248, 251-52).  The party moving for summary judgment bears the

---

[13]In *Clausen v. M/V New Carissa*, 339 F.3d 1049 (10th Cir. 2003), the court stated:

> As described by the Fourth Circuit,
>
> Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated. A reliable differential diagnosis typically, though not invariably, is performed after "physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests," and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.[ ]

*Clausen*, 339 F.3d at 1057 (footnote omitted) (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999) (citation and internal quotation omitted)).

initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); see also *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). Where the movant for summary judgment will not bear the burden of proof on a claim or issue at trial, the movant can satisfy this initial burden of production at summary judgment by pointing to specific portions of the record materials on file that either negate an essential element of the non-movant's claim or that affirmatively indicate "that the party bearing the burden of proof at trial will not be able to meet that burden." *Clark*, 929 F.2d at 608; *see also Four Parcels*, 941 F.2d at 1438 & n.19.

Once the moving party has met its burden, Rule 56(e), FED. R. CIV. P., "requires the nonmoving party to go beyond the pleadings and by affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324. "[T]he judge's function is not himself to weight the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Accordingly, in its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). But, if after sufficient time for discovery, the nonmoving party's evidence fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof [at trial]," *Celotex*, 477 U.S. at 323, the moving party is entitled to summary judgment.

## DISCUSSION

As stated by the defendant, the FTCA constitutes a limited waiver of the sovereign immunity of the United States for the acts of its agents under the substantive laws of the state where the alleged acts or omissions occurred. 28 U.S.C. §§ 2671, *et seq*. *See generally Means v. United States*, 176 F.3d 1376 (11th Cir. 1999) (applying FTCA's limited waiver of sovereign immunity with regard to state law claims against the Federal Bureau of Investigation and Jefferson County, Alabama officials). (Doc. 28 at p. 8). Accordingly, the substantive law of the State of Alabama is applicable in this instance. *Id*.

As previously noted, the defendant asserts that it is entitled to summary judgment for a number of reasons, including that no federal employee breached any duty owed to the plaintiff, that there is insufficient evidence to support the causation element of the plaintiff's claim, and the harm to the plaintiff was not within the foreseeable scope of risk. (Doc. 28). The plaintiff disputes the defendant's contentions. (Doc. 30).

### Duty and Breach of Duty Owed to the Plaintiff

"The Alabama Medical Liability Act imposes upon physicians a duty to 'exercise such reasonable care, diligence and skill as physicians ... in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case.' ALA. CODE 1975, § 6-5-484(a); *see also Keebler v. Winfield Carraway Hospital*, 531 So. 2d 841 (Ala. 1988)." *Pruit v. Zieger*, 590 So. 2d 236, 237 (Ala. 1991). Typically, a plaintiff in a medical malpractice action must establish the defendant physician's negligence through expert testimony as to the standard of care and the proper medical treatment. *Pruitt*, 590 So. 2d at 237-38 (citing *Bates v. Meyer*, 565 So. 2d 134, 136 (Ala.1990)). Simply stated, "the plaintiff must present expert

testimony establishing the appropriate standard of care." *Rivard v. University of Alabama Health Servs. Found., P.C.*, 835 So. 2d 987, 988 (Ala. 2002) (quoting *Bradford v. McGee*, 534 So. 2d 1076, 1079 (Ala. 1988)). The only exception is where "the breach of the standard of care is obvious to the average lay person." *Pruitt*, 590 So. 2d at 238.

In the present case, the defendant asserts that the plaintiff "has not shown through a similarly situated health-care provider' (*i.e.*, a dentist) that a federal employee breached any duty to Mr. Hammonds on November 3, 2005." (Doc. 28 at p. 11). More specifically, the United States argues that "the standard of care for dental practice in 2005 (and presently), provided that no premedication with antibiotics (antibiotic prophylaxis) was indicated on November 3, 2005, for the carious pulp removal and sedative filing dental procedure that Mr. Hammonds underwent. There was no duty that was breached." *Id*. at pp. 11-12 (footnote omitted).

The plaintiff offers a number of retorts. First, the plaintiff notes that the denial of his administrative claim by the United States included a "declaration that the dental standard of care mandated the taking of two grams of amoxicillin as a prophylactic measure prior to the commencement of the November 3, 2005 dental procedure." (Doc. 30 at p. 4). Accordingly, he argues that the "VA concluded that there was an applicable standard of care that the United States now suggests did not exist." *Id*. Secondly, the plaintiff asserts that Dr. Adams was the dentist who rendered the services to the plaintiff and therefore he is "similarly situated with himself and ... qualified to render expert-opinion testimony as to the applicable standard of care." *Id*. at pp. 4-5.

With regard to the first point, that the VA concluded that there was an applicable standard of care, the court is not swayed. Regardless of the position taken by the VA in the administrative

proceedings, the issue for this court, at this juncture, is what was the legal duty of care under the circumstances. The determination of the VA is not dispositive on that issue.

The plaintiff has presented evidence of the applicable standard of care in the form of deposition testimony from Dr. Adams, the doctor who performed Hammonds' pulp removal. Specifically, he stated in his deposition that the standard of care in November 2005 with respect to prophylactic antibiotic therapy for patients who had undergone hip replacement surgery like the plaintiff was two grams of amoxicillin one hour prior to the dental appointment. (Doc. 35-3 at p. 29 (Adams Dep. at p. 16)). Additionally, Dr. Adams stated that if a patient had not taken the antibiotic one hour prior to the procedure, the antibiotic should be administered and the procedure delayed for one hour. *Id*. at p. 33 (Adams Dep. at pp. 30-32 ).

Although the defendant has presented evidence which contradicts Adams' statements, these contradictions are not enough to support the granting of a motion for summary judgment on this basis. To the contrary, the evidence must be viewed in the light most favorable to the plaintiff. In order for a genuine issue of *material* fact to exist in a medical malpractice action, the nonmovant must present "expert testimony in support of [his] claim." *Swendsen v. Gross*, 530 So. 2d 764, 768 (Ala. 1988). As relates to the appropriate standard of care in November 2005, the testimony of Adams is sufficient as it concerns the plaintiff, a patient who had undergone a hip replacement. The plaintiff has presented a genuine issue of fact through this testimony. The larger question, however, is whether the issue involves a *material* dispute under the circumstances of this case or whether it involves a legal matter appropriate for disposition by the court.

The United States argues that where a patient such as Hammonds, who has no history of

9

heart problems, presents to a treating dentist, there is "no duty to premedicate him in order to reduce the risk of heart damage in the form of endocarditis." (Doc. 34 at p. 4). The plaintiff argues that he is not asserting "that the 'standard of care for the risk of heart infection was breached. Unquestionably, if Dr. Adams breached the standard of care for rendering dental service to a patient with a hip replacement, then, Dr. Adams failed to ensure that Hammonds had timely ingested a prophylactic antibiotic that would have afforded a shield against multiple infections, including endocarditis.'" (Doc. 30 at pp. 10-11). Hammonds further argues that it is a reasonable inference from Dr. Adams' testimony that because the antibiotics were required due to the hip replacement,

> that the ingestion of [the same] offered protection against infection in the replacement hip, **as well as, against endocarditis**. It is immaterial that Dr. Adams was primarily seeking to prevent an infection in the replacement hip, the prescribed prophylactic antibiotic simultaneously afforded protection against endocarditis. The risk was the development of bacterial related [infection] triggered by the dental procedure.

*Id*. at p. 10 (bold in original).

The "standard of care," as defined by Alabama law, is "that level of such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice, ordinarily have and exercise in like cases." ALA. CODE § 6-5-542(2). In this instance, the plaintiff argues that there is a *material* dispute because Adams defines the "standard of care" under the relevant circumstances as requiring the administration of the antibiotic. The United States disagrees.

As a part of its argument, the United States posits that summary judgment is due to be granted because the defendant "cannot be held liable for harm that grows out of a risk

unassociated with the medical problem he [(Adams)] has undertaken to treat: here the hip replacement infection risk." (Doc. 28 at p. 19).  The cases supplied by the United States simply state that foreseeability is a factor in determining the existence of a duty.  *See Dibiasi v. Joe Wheeler Elec. Membership Corp.*, 988 So. 2d 454, 461 (Ala. 2008); *Taylor v. Smith*, 892 So. 2d 887, 891-92 (Ala. 2004).  The plaintiff counters that endocarditis was a foreseeable risk if he did not timely ingest the prophylactic antibiotic prescribed for the November 3, 2005 procedure. (Doc. 30 at p. 12).  He does not offer any authority on the matter.  The court also has found no cases directly on point.

>Alabama law is clear:
>
>>In general, "every person owes every other person a duty imposed by law to be careful not to hurt him." *Southeastern Greyhound Lines v. Callahan*, 244 Ala. 449, 453, 13 So. 2d 660, 663 (1943).  In determining whether a duty exists in a given situation, however, courts should consider a number of factors, including public policy, social considerations, and foreseeability.  57A Am. Jur. 2d Negligence § 87, at 143 (1989).  The key factor is whether the injury was foreseeable by the defendant.  *See Keebler v. Winfield Carraway Hospital*, 531 So. 2d 841 (Ala. 1988), and cases cited therein.  The essential question is "whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 53, at 357 (5th ed. 1984).

*Smitherman v. McCafferty*, 622 So. 2d 322, 325 (Ala. 1993).  "Because '[t]he key factor [in establishing a duty] is whether the injury was foreseeable by the defendant,'" this court must determine if the defendant created a risk of harm under the circumstances so as to warrant the imposition of a legal duty upon it (via Adams).  *Pritchett v. ICN Medical Alliance, Inc.*, 938 So. 2d 933, 938 (Ala. 2006).  *See also Holt v. Lauderdale County* [No. 1050740], __ So. 2d ___, ___, 2008 WL 4823372, *5 (Ala. Nov. 7, 2008) ("A defendant will not usually be liable for harm that is unforeseeable, even when it is proven that the defendant breached a duty."); *see also e.g.*

11

*Thompson v. Gaier*, 512 So. 2d 775, 776 (Ala. 1987) (defendants held not liable for the plaintiff's injury, aggravation of back injury, caused when he turned to see "commotion" in his front yard resulting from the defendant's negligent operation of automobile, because such injury was not a foreseeable proximate result of the defendant's negligence).[14]

Based on the testimony of Adams, the court finds that a failure to follow the testified-to protocol when dealing with certain hip replacement patients exposed the plaintiff to a risk of harm from infection in his hip joints.[15] (Adams Dep. at p. 16). The plaintiff seeks to transfer that risk of harm to the risk of developing a "bacterial-related [infection] triggered by the dental procedure." (Doc. 30 at p. 10). The court, however, finds that it would be inappropriate under the circumstances to impose such a general duty.

Nowhere in the expert testimony of Patel, Adams, or Jasser is there any basis for imposition of such a duty. For instance, Jasser stated that he never said that "Hammonds should have received antibiotics. ... [He] said if he [(Hammonds)] would have received it [sic], it [sic] would have prevented that [(endocarditis)]."[16] (Jasser Dep. at p. 43). Patel stated that

---

[14] The Second Restatement of Torts also provides, "Where the harm which in fact results is caused by the intervention of factors or forces which form no part of the recognizable risk involved in the actor's conduct, the actor is ordinarily not liable. This is subject, however, to the qualification that where the harm which has resulted was itself within the risk created, the fact that it has been brought about in a manner which was not to be expected, or by the intervention of forces which were not within the risk, does not necessarily prevent the actor's liability. " Restatement (2d) of Torts (1965), § 281 cmt. f.

[15] For purposes of this discussion, the court finds that Adams did not timely provide the antibiotic. Although the defense has offered a different version of the events based on the testimony of Adams, whether or not Hammonds took the antibiotics, when he might have taken the antibiotics, and whether Adams waited the hour before initiating the pulp removal procedure are all questions of fact that must be weighed in favor of the plaintiff as the nonmovant. Adams testified that the appropriate standard of care was to give Hammonds antibiotics one hour prior to the dental procedure. Hammonds testified that Adams did not wait an hour after administering the antibiotics. Accordingly, the court must accept Hammonds' testimony that he told Adams that he did not take the antibiotics prior to the commencement of the procedure and that Adams did not wait the required hour.

[16] Jasser's deposition clearly demonstrates that his conclusion that the endocarditis was caused by the dental work was premised upon temporal proximity. (See e.g. Jasser Dep. at p. 42 (The fact that endocarditis can result from everyday activities does not change the fact that "the patient got endocarditis after dental work.")).

"Hammonds did not require antibiotic prophylaxis to prevent infective endocarditis based on the existing guidelines for prevention of infective endocarditis in a person undergoing dental procedures." (Patel Ltr. (Doc. 35-3) at p. 90 (Ex. B)). Lastly, Adams stated that the antibiotic therapy was for hip replacement patients. (Adams Dep. at p. l6). He further stated that it was his understanding that the antibiotic regime was "to prevent any infections in the joints that had been replaced."[17] Id. at pp. 17, 22.

Because the court finds that there was no legal duty to give the plaintiff an antibiotic regime preceding the carious pulp removal and sedative filing dental procedure beyond the risk associated with the hip replacement, there can be no breach. Accordingly, summary judgment is due to be granted on behalf of the defendant.[18]

## CONCLUSION

Premised on the foregoing, the court concludes that the defendant's motion for summary judgment (doc. 27) is due to be granted. An appropriate order will be entered.

**DONE**, this the 28th day of August, 2009.

*/s/ John E. Ott*
_____
**JOHN E. OTT**
United States Magistrate Judge

---

[17] Additionally, the court notes that the pertinent American Heart Association ("AHA") protocol did not require that did not require the administration of prophylactic antibiotics. (Adams Dep. at pp. 21-24). The AHA protocol for prophylactic treatment of patients with a known heart disease or condition is not applicable in this instance.

Still further, as acknowledged by Jasser, the "growing body of scientific evidence ... shows that the risk of taking preventive antibiotics outweigh[s] the benefits for most patients." (Jasser Dep. at p. 41).

[18] Because the court finds that this matter is to be disposed of under the duty element, the undersigned will pretermit any further discussion, including the issue of proximate cause.